# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | | |
|---|---|---|
| TRACY COLLINS; KEITH B. HUMPHREY; JOSEPH R. DIAZ; JUDITH MCDANIEL; BEVERLY SECKINGER; STEPHEN RUSSELL; DEANNA PFLEGER; COREY SEEMILLER; CARRIE SPERLING; AND LESLIE KEMP, | ) ) ) ) ) ) ) ) ) ) | 2:09-cv-02402 JWS<br><br>ORDER AND OPINION<br><br>[Re: Motions at Docket 22 and 31] |
| **Plaintiffs,** | ) ) ) | |
| vs. | ) ) | |
| JANICE K. BREWER, in her official capacity as Governor of the State of Arizona; DAVID RABER, in his official capacity as Interim Director of the Arizona Department of Administration and Personnel Board; KATHY PECKHARDT, in her official capacity as Director of Human Resources for the Arizona Department of Administration and Personnel Board, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## I. MOTIONS PRESENTED

At docket 22, defendants Governor Janice K. Brewer, David Raber, and Kathy

Peckhardt (collectively "the State") move to dismiss the amended complaint filed by

plaintiffs Tracy Collins, Keith B. Humphrey, Joseph R. Diaz, Judith McDaniel,[1] Beverly Seckinger, Stephen Russell, Deanna Pfleger, Corey Seemiller, Carrie Sperling, and Leslie Kemp (collectively "plaintiffs").  At docket 23, plaintiffs oppose the motion.  The State replies at docket 27.  In addition, plaintiffs have filed a motion for preliminary injunction at docket 31.  At docket 40, the State opposes the motion.  Plaintiffs reply at docket 41.  Oral argument on both motions was heard on June 28, 2010.

## II.  BACKGROUND

As part of the State's personnel compensation system, the State provides subsidized health care benefits to eligible employees and their dependents.  The Arizona Administrative Code currently defines dependents eligible to participate in the health benefit plan as an "employee-member's spouse as provided by law or domestic partner," and "[e]ach child,"[2] which is defined as including a "natural child, adopted child, or stepchild of the employee-member, retiree, former elected official, or domestic partner."[3]

Section R2-5-101(22) of the Arizona Administrative Code defines "domestic partner" as a "person of the same or opposite gender who:"

a. Shares the employee's or retiree's permanent residence;
b. Has resided with the employee or retiree continuously for at least 12 consecutive months before filing an application for benefits and is expected to continue to reside with the employee or retiree indefinitely as evidenced by an affidavit filed at time of enrollment;

---

[1]Plaintiff Judith McDaniel's claims recently became moot due to her obtaining new employment which provides family health insurance for her domestic partner. Doc. 31 at p. 2 n.1.

[2]Ariz. Admin. Code § R2-5-416(C).

[3]Ariz. Admin. Code § R2-5-101(10).

c. Has not signed a declaration or affidavit of domestic partnership with any other person and has not had another domestic partner within the 12 months before filing an application for benefits;

d. Does not have any other domestic partner or spouse of the same or opposite sex;

e. Is not currently legally married to anyone or legally separated from anyone else;

f. Is not a blood relative any closer than would prohibit marriage in Arizona;

g. Was mentally competent to consent to contract when the domestic partnership began;

h. Is not acting under fraud or duress in accepting benefits;

i. Is at least 18 years of age; and

j. Is financially interdependent with the employee or retiree in at least three of the following ways:

> i. Having a joint mortgage, joint property tax identification, or joint tenancy on a residential lease;
>
> ii. Holding one or more credit or bank accounts jointly, such as a checking account, in both names;
>
> iii. Assuming joint liabilities;
>
> iv. Having joint ownership of significant property, such as real estate, a vehicle, or a boat;
>
> v. Naming the partner as beneficiary on the employee's life insurance, under the employee's will, or employee's retirement annuities and being named by the partner as beneficiary of the partner's life insurance, under the partner's will, or the partner's retirement annuities; and
>
> vi. Each agreeing in writing to assume financial responsibility for the welfare of the other, such as durable power of attorney; or
>
> vii. Other proof of financial interdependence as approved by the Director.

Currently, state employees in homosexual domestic partnerships may obtain the same coverage bestowed upon married heterosexual couples, provided the lesbian or gay employee and her or his partner can satisfy the above criteria.[4]  The State provides approximately $750 million in health, dental, life disability, and vision benefits to

---

[4]Ariz. Admin. Code § R2-5-101.

approximately 140,000 State employees, retirees, and their dependents.[5]  Such

employment benefits are commonly valued "at between one-fifth and one-third of total

compensation."[6]  Approximately 800 of the 140,000 participating State employees

receive benefits for a qualifying domestic partner.  A small fraction of those 800

employees receive benefits for a same-sex domestic partner.[7]

On August 20, 2009, the Arizona House of Representatives transmitted House

Bill ("H.B.") 2013 to defendant Brewer for review, consideration, and approval or

rejection in her capacity as Arizona Governor.   H.B. 2013 amends A.R.S. § 38-651,

which authorizes the Department of Administration to expend funds on health and

accident insurance for State employees and their eligible dependents.  The amendment

added a new section, Section O, which provides that "[f]or the purposes of this section,

beginning October 1, 2009, 'dependent' means a spouse under the laws of this state, a

child who is under nineteen years of age or a child who is under twenty-three years of

age and who is a full-time student."[8]

Section O eliminates family coverage for non-spouse domestic partners, whether

they are of the same or different sex.  Heterosexual domestic partners may continue to

receive subsidized family health coverage by getting married.  Same-sex couples are

precluded from obtaining coverage because Section O limits coverage to "spouses"

under the laws of Arizona.  The Arizona Constitution prevents same-sex couples from

---

[5]Doc. 19 at p. 7.

[6]*Id.* at p. 33.

[7]*Id.* at p. 31.

[8]A.R.S. § 38-651(O).

marrying and prohibits the State from honoring a civil marriage entered by a same-sex

couple in another jurisdiction.[9]  Similarly, the Arizona Revised Statutes limit marriage to

"a male person and a female person."[10]  Governor Brewer signed H.B. 2013 on

September 4, 2009.

Section O specified an intended effective date of October 1, 2009.  On

September 25, 2009, the Department of Administration announced that it would

recognize November 24, 2009 as the effective date of the statute.  On October 9, 2009,

the Department posted another announcement indicating that, based on legal advice

from the Office of the Attorney General, the definition of "dependent" for the State

insurance plan year beginning October 1, 2009 would not be affected by H.B. 2013 so

as not to impair the contractual expectations of State employees.  On July 22, 2010, the

State filed a notice indicating that the State's current benefit plan, including domestic

partner coverage, will be extended through December 31, 2010.[11]  The definition of

"dependent" currently in place will remain effective through December 31, 2010; the

new definition of "dependent" in H.B. 2013 will go into effect on January 1, 2011.

On January 7, 2010, plaintiffs filed an amended complaint against the State

seeking declaratory and injunctive relief.[12]  Plaintiffs' amended complaint alleges in part,

> The selective withdrawal of family coverage from lesbian and gay State
> employees - while leaving family coverage intact for heterosexual State
> employees with a legally recognized spouse - will deny each Plaintiff equal

---

[9]Ariz. Const. Art. 30 § 1.

[10]A.R.S. § 25-125.

[11]Doc. 46.

[12]Doc. 19.

compensation for equal work and discriminatorily inflict upon each Plaintiff and his or her family members anxiety, stress, risk of untreated or inadequately treated health problems, and potentially ruinous financial burdens.[13]

Plaintiffs' complaint requests the court to enter judgment declaring that the portion of A.R.S. § 38-651(O) that limits eligibility for family coverage to an employee-member's "spouse" or a spouse's child, "to the exclusion of lesbian and gay State employees with a committed same-sex life partner" violates the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

Plaintiffs' complaint further requests the court to permanently enjoin defendants' enforcement of the portion of A.R.S. § 38-651(O) that limits eligibility to an employee-member's spouse and spouse's child to the exclusion of lesbian and gay State employees with a same-sex life partner. In addition, plaintiffs request an order requiring defendants to "maintain family coverage, on terms equal to the family coverage [d]efendants offer to heterosexual State employees who marry a different-sex life partner, for [p]laintiffs and other qualifying lesbian and gay State employees with a committed same-sex life partner who satisfy the relevant eligibility criteria specified in the Ariz. Admin. Code § R2-5-101."[14]

All of the plaintiffs are highly skilled State employees whose job duties are equivalent to the duties of their heterosexual colleagues.[15] Each of the nine plaintiffs and his or her domestic partner have enjoyed a long-term, committed, and financially

---

[13]Doc. 19 at p. 3.

[14]*Id.* at p. 46.

[15]*Id.* at p. 12.

interdependent relationship and would marry if Arizona law permitted same-sex couples to marry.[16]  Each plaintiff enrolled her or his domestic partner and/or domestic partner's qualifying children for family coverage during the 2008 or 2009 open enrollment period, and each plaintiff and her or his domestic partner or partner's children met the eligibility requirements for coverage at the time of enrollment and continue to meet those requirements.[17]  As result of the adoption and enforcement of Section O, each named plaintiff will lose health insurance coverage for his or her domestic partner, and/or domestic partner's children on October 1, 2010.

### III. STANDARD OF REVIEW

A motion to dismiss for failure to state a claim made pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims in the complaint.[18]  In reviewing a Rule 12(b)(6) motion to dismiss, "[a]ll allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party."[19]  "Conclusory allegations of law, however, are insufficient to defeat a motion to dismiss."[20]  A dismissal for failure to state a claim can be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."[21]  To avoid dismissal under Rule 12(b)(6), plaintiffs' complaint must aver

---

[16]*Id.* at pp. 13-30.

[17]*Id.* at p. 10.

[18]*De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978).

[19]*Vignolo v. Miller*, 120 F.3d 1075, 1077 (9th Cir. 1997).

[20]*Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001).

[21]B*alistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).

"sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[22]

**IV. DISCUSSION**

**A. Motion to Dismiss**

    **1. Equal Protection Claim**

The State first argues that plaintiffs' complaint fails to state a claim under the Equal Protection Clause of the Fourteenth Amendment because Section O passes constitutional muster under rational basis review. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike."[23] The first step in equal protection analysis, therefore, is to identify the classification of groups within the statute or regulations in question.[24] "To accomplish this, a plaintiff can show that the law is applied in a discriminatory manner or imposes different burdens on different classes of people."[25]

The State contends that Section O is a neutral policy that treats all unmarried employees equally. Plaintiffs argue that "Section O deliberately classifies State employees into two groups - heterosexual employees who are offered a way to qualify

---

[22]*al-Kidd v. Ashcroft,* 580 F.3d 949, 956 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal citation omitted)).

[23]*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (quotation omitted).

[24]*Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 589 (9th Cir. 2008).

[25]*Id.* (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir.1995)).

for family health insurance, and lesbian and gay State employees who are deprived of any way to qualify for those benefits,"[26] and as such are denied equal compensation for equal work. Section O, when read together with Arizona Constitution Article 30 § 1, treats unmarried heterosexual State employees differently than unmarried homosexual employees. Heterosexual domestic partners may become eligible for family coverage under the State plan by marrying. Because employees involved in same-sex partnerships do not have the same right to marry as their heterosexual counterparts, Section O has the effect of completely barring lesbians and gays from receiving family benefits. Consequently, the spousal limitation in Section O burdens State employees with same-sex domestic partners more than State employees with opposite-sex domestic partners.

While Section O is not discriminatory on its face, as applied Section O "unquestionably imposes different treatment on the basis of sexual orientation,"[27] and makes benefits available on terms that are a legal impossibility for gay and lesbian couples. As a result, Section O denies lesbian and gay State employees in a qualifying domestic partnership a valuable form of compensation on the basis of sexual orientation. As early as 1990, the Ninth Circuit recognized that "state employees who treat individuals differently on the basis of their sexual orientation violate the constitutional guarantee of equal protection."[28] Because the spousal limitation in

---

[26]Doc. 23 at p. 4.

[27]*In re Levenson*, 560 F.3d 1145, 1147 (9th Cir. 2009) (quoting *In re Marriage Cases*, 183 P.3d 384, 441 (Cal. 2008)).

[28]*Flores v. Morgan Hill Unified School Dist.*, 324 F.3d 1130, 1137 (9th Cir. 2003) (quoting *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 573-74 (9th Cir.

Section O imposes different burdens on the basis of sexual orientation, it is subject to scrutiny under the Equal Protection Clause.

"The basic principles governing the application of the Equal Protection Clause of the Fourteenth Amendment are familiar."[29]  In applying the Equal Protection Clause, the Supreme Court "has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of people in different ways."[30]  The Equal Protection Clause does, however, deny States "the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute."[31]  "A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'"[32]  Whether a statute "bears a rational relationship to a legitimate state interest is primarily an objective inquiry."[33]

Plaintiffs contend that some form of heightened scrutiny should apply to an evaluation of Section O's constitutionality, because it treats State employees differently on the basis of their sexual orientation; because homosexuals have experienced a

---

1990)).

[29] *Eisenstadt v. Baird*, 405 U.S. 438, 446 (1972) (citing *Reed v. Reed*, 404 U.S. 71 (1971)).

[30] *Reed*, 404 U.S. at 75.

[31] *Id.* at 75-76.

[32] *Id.* at 76 (quoting *Royster Guano Co. v. Virginia*, 253 U.S.412, 415 (1920)).

[33] *Perry v. Schwarzenegger*, 591 F.3d 1147, 1165 (9th Cir. 2010).

history of purposeful unequal treatment and are politically vulnerable; and because

sexual orientation is an immutable characteristic which does not bear upon a person's

ability to contribute to society as a productive employee.  Some form of heightened

scrutiny might apply to plaintiffs' claims, but it is unnecessary to decide whether or

which type of heightened scrutiny might apply to plaintiffs' claims because plaintiffs

have averred in their complaint sufficient factual matter, accepted as true, to state an

equal protection claim that is plausible on its face even under the rational basis

standard of review.[34]

Applying the rational basis standard, the question before the court is whether the

spousal limitation in Section O bears "a rational relationship to an independent and

legitimate legislative end."[35]  The statute is presumed constitutional, and the burden is

on those attacking the rationality of the legislative classification "to negative every

conceivable basis which might support it."[36]  However, "even the standard of rationality

... must find some footing in the realities of the subject addressed by the legislation."[37]

Moreover, the court applies a "more searching form of rational basis review" when a

classification harms politically unpopular groups or personal relationships.[38]

---

[34] See In re Levenson, 587 F.3d 925, 931(9th Cir. 2009).

[35] Romer v. Evans, 517 U.S. 620, 633 (1996).

[36] Heller v. Doe by Doe, 509 U.S. 312, 320 (1993) (internal citations and quotation omitted).

[37] Immigrant Assistance Project of Los Angeles County Federal of Labor v. I.N.S., 306 F.3d 842, 872 (9th Cir. 2002) (quoting Heller, 509 U.S. at 321).

[38] See, e.g., Lawrence v. Texas, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring) (("When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal

The State offers the following rationales for Section O: (1) the statute "will save the State millions of dollars per year"; (2) the statute will be "much easier to administer";[39] (3) "scarce funds for employee benefits are better spent on employees and dependents as defined in the new statute"; (4) "this benefit would be most valuable to married persons, who are more likely to have dependent children"; and, (5) the new statute "would further the rational, long-standing and well-recognized government interest in favoring marriage."[40]  Plaintiffs argue there is no legitimate interest served by denying  lesbian and gay State employees, including plaintiffs, equal compensation in the form of subsidized family coverage.

### a.  Cost Savings

The State argues that the cost savings of limiting benefits to "spouses" of employee-members is sufficient to satisfy the rational basis test.  Plaintiffs argue that the State may not "protect the public fisc by drawing an invidious distinction between classes of its citizens."[41]  The court must agree, for the Supreme Court has held that, although "a State has a valid interest in preserving the fiscal integrity of its programs,"

_____

Protection Clause."); *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973) (holding that an amendment preventing households containing unrelated individuals from receiving food stamps violated equal protection because it was intended to prevent "hippies" from participating in food stamp program); *Romer*, 517 U.S. at 632 (finding that an amendment that made it more difficult for one group of citizens - homosexuals - to seek aid from the government denies equal protection of the laws); *Eisenstadt*, 405 U.S. at 454 (concluding that under the Equal Protection Clause, the State could not outlaw distribution of contraceptives to unmarried persons but not to married persons).

[39]Doc. 22 at 8-9.

[40]*Id.* at 10.

[41]Doc. 23 at 9 (quoting *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 263 (1974)).

the State may not attempt to "limit its expenditures . . . by invidious distinctions between classes of its citizens."[42]  That proposition applies here because the spousal limitation in Section O rests on an invidious distinction between heterosexual and homosexual State employees who are similarly situated.[43]

Plaintiffs allege that offering family coverage to "the small pool of lesbian and gay State employees who otherwise are categorically barred from family coverage because they cannot marry causes only negligible costs for the State."[44]  Plaintiffs' complaint specifically alleges that "family coverage for lesbian and gay State employees with a same-sex life partner costs far less than the half-of-one-percent-of-health-costs figure ... attributable to unmarried domestic partners generally,"[45] and that "the minimal costs of offering family coverage to lesbian and gay State employees is offset by the resulting reduced use of AHCCCS,[46] which is more costly on average to the State than allowing employees to share the cost of their health insurance by paying a portion of the premium for family coverage."[47]  For purposes of the motion to dismiss, these facts must be accepted as true.  Thus, plaintiffs have demonstrated that denying benefits to same-

---

[42]*Graham v. Richardson*, 403 U.S. 365, 374 (1971) (quoting *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969)).

[43]*Eisenstadt*, 405 U.S. at 454.

[44]Doc. 19 at p. 31.

[45]*Id.*

[46]Arizona Health Care Cost Containment System ("AHCCCS") is Arizona's Medicaid agency.

[47]Doc. 19 at p. 32.

sex domestic partners of State employees is not rationally, much less substantially, related to the purported rationale of cost savings.

Moreover, if the State's interest were "simply saving money, the companion goal of promoting marriage would seem to do the opposite."[48]  If Section O succeeds in promoting marriage, the State will have to provide health benefits to more people, thus increasing the State's expenditures.

### b.  Administrative Efficiency

The State next argues that restricting the definition of "dependent" to "spouse" in Section O results in a benefits system that is easier to administer, and that "simplifying a complex administrative program is the sort of rational basis that justifies a distinction between married and unmarried participants."[49]  Plaintiffs claim that "purported administrative convenience [cannot] justify singling out lesbian and gay employees for disfavored treatment."[50]

The Supreme Court noted in *Frontiero v. Richardson* that "although efficacious administration of governmental programs is not without some importance, 'the Constitution recognizes higher values than speed and efficiency.'"[51]  While the State claims that "the restricted definition of dependent results in a benefits system that is much easier and less expensive to administer," the savings arise from an impermissible invidious classification which imposes costs on lesbians and gays by stripping their

---

[48]*Alaska Civil Liberties Union v. State of Alaska*, 122 P.3d 781, 790 (Alaska 2005).

[49]Doc. 22 at p. 9.

[50]Doc. 23 at p. 10.

[51]411 U.S. 677, 690 (1973) (quoting *Stanley v. Illinois*, 405 U.S. 645, 656 (1972)).

-14-

dependents of health care benefits, which the dependents of their heterosexual counterparts would continue to enjoy.

In addition, the State has already implemented a set of criteria domestic partners must meet to show their financial interdependence, commitment, and dependency and has successfully applied the criteria to those few State employees who apply for benefits for their same-sex domestic partners.  There is little or no continuing administrative burden on the State in providing health coverage to plaintiffs and their partners, all of whom have already met the eligibility requirements for coverage.  Applying the existing standards to the occasional new gay or lesbian applicant would be a minimal burden.

### c.  Funds Better Spent on Heterosexual Spouses

The State contends that another rational basis for the spousal limitation in Section O is that "scarce funds for employee benefits are better spent on employees and dependents as defined in the new statute."[52]  Plaintiffs argue that the State's rationale is discriminatory on its face, and not a rational state interest.  The court concurs.  The State's justification raises "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected,"[53] namely toward same-sex domestic partners who by law cannot become spouses.  "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a

---

[52]Doc. 22 at p. 10.

[53]Romer, 517 U.S. at 635.

*legitimate* governmental interest."[54] "*Romer* makes clear that a simple desire to treat gays and lesbians differently is not, in and of itself, a proper justification for government actions. Discrimination against gays and lesbians, or same-sex couples, must, at the very least, serve some more substantive and lawful function."[55]

### d. Interest in Favoring Marriage and Families with Children

The State also contends that limiting family coverage to "spouses" and their children is rational because it would further the "long-standing and well-recognized government interest in favoring marriage" and family coverage "would be more valuable to married persons, who are more likely to have dependent children."[56] Plaintiffs argue that the State's purpose to favor or promote marriage "simply restates an intent to privilege [heterosexual] employees along invidious lines."[57] In addition, plaintiffs indicate that six out of the nine same-sex couples represented in this action are raising children together. Plaintiffs further claim that "Section O cannot be said to promote the welfare of children" when its effect is to "arbitrarily strip[] benefits from one group of employees with children who are no less worthy of insurance."[58]

The State cites *Irizarry v. Board of Education of the City of Chicago*[59] for the proposition that the government's interest in favoring marriage and procreation is

---

[54]*Id.* (quoting *Moreno*, 413 U.S. at 534).

[55]*Levenson*, 587 F.3d at 932 (citing *Romer v. Evans*, 517 U.S. 620 (1996)).

[56]Doc. 22 at p. 10.

[57]Doc. 23 at p. 12.

[58]*Id.*

[59]251 F.3d 604 (7th Cir. 2001).

"rational, long-standing and well-recognized."[60]  However, *Irizarry* did not decide the question of whether the promotion of marriage was a rational justification for distinguishing between heterosexuals and homosexuals.[61]  In any event, unlike *Izirarry*, the question before this court is whether Section O's distinction between heterosexual and homosexual employees is rationally related to the State's interest in promoting marriage and families with children.  The court concludes that it is not.

The Supreme Court has characterized marriage as "the most important relation in life,"[62] but construing the facts of the complaint as true it cannot be said that Section O's distinction between heterosexual and homosexual employees is legitimately, rationally, and substantially related to promoting that interest.  Certainly, that aspect of Section O which is challenged, the denial of benefits to State employee's same-sex domestic partners, cannot promote marriage because gays and lesbians are ineligible to marry.[63]  It is only by denying benefits to heterosexual domestic partners that marriage might be promoted.  However, denying benefits to heterosexual partners (who can marry in order to obtain benefits) does not require denial of those benefits to homosexual partners (who cannot marry).   It is possible that the State's proffered

---

[60]Doc. 22 at 10 (citing *Irizarry*, 251 F.3d at 607).

[61]*Irizarry*, 251 F.3d at 607-08.

[62]*Zabolcki v. Redhail*, 434 U.S. 374, 384 (1978) (quoting *Maynard v. Hill*, 125 U.S. 190, 205 (1888)).

[63]*Alaska Civil Liberties Union v. State of Alaska*, 122 P.3d 781, 793 (Alaska 2005).

interest in promoting or protecting marriage and procreation is a *post hoc* justification in response to litigation.[64]

The State's interests in cost control, administrative efficiency, and promotion of marriage are legitimate. However, construing the facts alleged in the complaint as true, the absolute denial of benefits to employees with same-sex domestic partners is not rationally and substantially related to these governmental interests. Moreover, the court cannot identify any other governmental interests that might be served by denying plaintiffs the same access to family medical coverage afforded to heterosexual State employees.[65] Accordingly, the court denies the State's motion to dismiss plaintiffs' equal protection claim.

### 2. Substantive Due Process Claim

The State next moves to dismiss plaintiffs' claims under the Substantive Due Process Clause of the Fourteenth Amendment for failing to state a claim upon which relief may be granted. Plaintiffs argue that Section O burdens their fundamental right to form and sustain intimate family relationships under the substantive due process framework articulated in *Lawrence v. Texas*[66] and *Witt v. Department of the Air Force.*[67]

The State argues, on the other hand, that the State's refusal to fund the exercise of even a fundamental right does not amount to an interference with that right, citing

---

[64]*United States v. Virginia*, 518 U.S. 515, 532 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.")

[65]*Levenson*, 587 F.3d at 934.

[66]539 U.S. 558 (2003).

[67]527 F.3d 806 (2008).

*Ysura v. Pocatello Education Association.*[68]  The State further asserts that Section O in no way burdens plaintiffs' liberty interests because, assuming plaintiffs' allegations are true, their "long-term and stable relationships . . . flourished years before the domestic partner benefit was first established in 2008."[69]  Finally, the State claims that "[i]t cannot be seriously contended that optional employees health insurance is deeply rooted in the Nation's history and traditions"[70] and, therefore, "is not a fundamental right protected by due process."[71]

The State has the more persuasive argument.  As an initial matter, *Ysura* held, in the context of a free speech challenge to Idaho's ban on public-employee payroll deductions for political activities, that a State's "decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny."[72]  Thus, even if the court were to find that plaintiffs' right to form and sustain intimate family relationships was indirectly burdened, it would be constitutionally permissible, under rational basis review, for the State to discontinue funding health benefits.  While plaintiffs are correct that the availability of health insurance is a "valuable benefit of employment," there is no fundamental right to such a benefit.

---

[68]— U.S. —, 129 S.Ct. 1093 (2009).

[69]*Id.*

[70]*Id.* at 13.

[71]Doc. 27 at 7.

[72]*Ysura*, 129 S. Ct. at 1098 (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983)).

Although it likely would put the State at a competitive hiring disadvantage, it is free to refuse its employees health benefits under the U.S. Constitution.

In that regard, the State is also correct that State employees do not have a fundamental right to dependent health benefits. This is not a case like *Lawrence*, where the right to engage in private, consensual sexual activity was burdened by a law banning homosexual conduct which, in turn, burdened the rights of homosexuals to engage in private relations within their own home, which was deemed fundamental. Here, plaintiffs' stated right to form and sustain family relationships is not burdened by Section O. As the State points out, most of the plaintiffs have been in committed relationships with their respective domestic partners for upwards of 20 years, commencing long before domestic partner benefits were extended to them. Moreover, it is not tenable to assert that people who are devoted to one another in the manner of the plaintiffs would opt to avoid commitment simply because one partner could not secure health benefits for the other.

Plaintiffs' argument that *Witt* "made clear that adverse employment actions - such as Section O's elimination of valuable health benefits - constitute sufficient injury to give rise to an actionable due process claim" ignores the salient limitation in *Witt*, namely, that *Lawrence*-based claims must involve a government intrusion of some sort. Indeed, *Witt* set forth the following heightened scrutiny analysis to be used in evaluating a *Lawrence*-based substantive due process claim,

> [W]hen the government attempts to intrude upon the personal and private lives of homosexuals, in a manner that implicates the rights identified in *Lawrence*, the government must advance an important governmental interest, the intrusion must significantly further that interest, and the intrusion must be necessary to further that interest. In other words, for the

third factor, a less intrusive means must be unlikely to achieve substantially the government's interest.[73]

Here, plaintiffs have been unable to articulate the way in which the State has intruded into their personal and private affairs. Indeed, under the present statutory scheme, the State intrudes far deeper into plaintiffs' lives by inquiring of their eligibility for domestic partner benefits than it would after Section O's implementation. Because plaintiffs cannot point to a constitutionally remediable intrusion, plaintiffs have failed to state a substantive due process claim that is plausible on its face and their substantive due process claim is dismissed. As discussed above, plaintiffs' remedy lies in the Equal Protection Clause.

### 3. Immunity of Defendant Brewer

Finally, the State contends that "because Governor Brewer is entitled to legislative immunity for signing [H.B.] 2013 and 42 U.S.C. § 1983 does not permit claims for vicarious liability, she should be dismissed from this lawsuit."[74] Plaintiffs argue that they do not seek an order in connection with Governor Brewer's signing H.B. 2013 or an order based on vicarious liability.[75] Rather, plaintiffs seek to enjoin Governor Brewer from enforcing Section O based on her specific statutory duty in A.R.S. § 41-703(1) to oversee the Department of Administration's operations to

---

[73]*Witt*, 527 F.3d at 819.

[74]Doc. 27 at p. 11.

[75]Doc. 41 at pp. 7-8.

eliminate family health insurance eligibility for same-sex domestic partners of State

employees.[76]  Plaintiffs' amended complaint alleges in pertinent part:

> 168.  Upon information and belief, Defendant Brewer has the duty and authority to ensure that the Department implements Section O, and through her own individual actions, has acted and, if not enjoined, will continue to act personally to violate Plaintiffs' right to equal protection by implementing Section O to strip Plaintiffs discriminatorily of access to family coverage for a committed same-sex life partner, thereby proximately causing Plaintiffs' injury.[77]

The State argues that if plaintiffs' argument is accepted, Governor Brewer "could

be sued every time someone challenges the constitutionality of any statute ... based on

the general theory that a state's chief executive is charged with the enforcement of all

its laws."[78]  Perhaps that is so, but it is hard to see why that makes a difference.

Moreover, in another action pending before this court which seeks injunctive and

declaratory relief based on the passage of Senate Bill 1017, Governor Brewer sought

and received leave to intervene "both in her official capacity and on behalf of the State

of Arizona - pursuant to her role as the highest executive voice in the State and to

ensure that SB 1070 is 'faithfully executed.'"  In support, Governor Brewer argued that

"Article 5, Section 4 of the Arizona Constitution provides [the governor] with the duty to

'take care that the laws be faithfully executed' and to 'transact all executive business

---

[76]A.R.S. § 41-703(1) provides that the director of the Department of Administration shall "[b]e directly responsible to the governor for the direction, control and operation of the department."

[77]Doc. 19 at p. 36.

[78]Doc. 27 at p. 9.

with the officers of the government...."[79]  Governor Brewer is subject to suit in her role

as "the highest executive voice in the State" in this action as well.

Citing *al-Kidd v. Aschcroft*,[80] plaintiffs also seek to enjoin defendant Brewer

based on her status as an official with supervisory responsibility.  The State argues that

even if Governor Brewer is responsible for supervising the other named defendants, "a

supervisor may be liable only if the supervisor is personally involved in the constitutional

deprivation or there is a causal connection between the supervisor's conduct and the

constitutional violation."[81]

In *al-Kidd*, the Ninth Circuit recognized that "direct, personal participation is not

necessary to establish liability for a constitutional violation."

> Supervisors can be held liable for the actions of their subordinates (1) for setting
> in motion a series of acts by others, or knowingly refusing to terminate a series of
> acts by others, which they knew or reasonably should have known would cause
> others to inflict constitutional injury; (2) for culpable action or inaction in training,
> supervision, or control of subordinates; (3) for acquiescence in the constitutional
> deprivation by subordinate; or (4) for conduct that shows a 'reckless or callous
> indifference to the rights of others.'[82]

"Any one of these bases will suffice to establish the personal involvement of the

defendant in the constitutional violation."[83]

Plaintiffs' amended complaint alleges that defendant Brewer "directly caused

action by others to enforce and implement Section O which [she] knew, or reasonably

---

[79] *Friendly House v. Whiting*, 2:10-cv-01061, Doc. 51 at p. 5.

[80] 580 F.3d 949 (9th Cir. 2009).

[81] Doc. 22 at p. 15.

[82] *al-Kidd*, 580 F.3d at 965.

[83] *Id.*

should have known, would cause others to inflict these constitutional injuries upon Plaintiffs"; "knowingly refused to prevent anticipated action by others who are charged to implement State law and policies under her supervision, including Section O's elimination of family coverage for Plaintiffs"; has caused and acquiesced in this constitutional deprivation to be effectuated by her subordinates"; and, "has engaged in conduct demonstrating a reckless and callous indifference to the constitutional rights of Plaintiffs."[84]

Taken as true, plaintiffs have pled enough facts to state a claim of supervisory liability against defendant Brewer that is plausible on its face. "Were this case before [the court] on summary judgment, and were the facts pled in the complaint the only ones in the record, [the court's] decision might well be different."[85] However, the plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence to prove that claim."[86]

## B. Motion for Preliminary Injunction

Plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 enjoining the State from enforcing the portion of A.R.S. § 38-651(O) that restricts family health insurance to State employees with a spouse "to the extent that Section O eliminates Plaintiffs' eligibility to qualify for State employee family health

---

[84]Doc. 19 at p. 37

[85]*al-Kidd*, 580 F.3d at 977.

[86]*Id.*

insurance covering each Plaintiff's same-sex life partner and that partner's qualifying children."[87] As explained by the Supreme Court, "plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest."[88]

### 1. Likelihood of Success on the Merits

The State argues that plaintiffs "have no chance of success on the merits unless they can establish that there is no possible rational basis for the new definition of dependent."[89] As discussed above, construing the facts alleged in the complaint as true, plaintiffs have demonstrated that the absolute denial of benefits to employees with same-sex domestic partners is not rationally and substantially related to the State's purported interests in cost savings, administrative efficiency, and favoring marriage and families with children.

In support of their motion for preliminary injunctive relief, plaintiffs attach further evidence that Section O is not rationally related to the State's purported interests in cost savings and administrative efficiency, including a report produced by the State, entitled "Annual Check-Up Benefit Options October 1, 2008 through September 30, 2009," which summarizes the efficiency and effectiveness of the State health plan during 2008-

---

[87]Doc. 31 at p. 2.

[88]*Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter v. Natural Resource Defense Council, Inc.*, --- U.S. ---, 129 S.Ct. 365, 374 (2008)).

[89]Doc. 40 at p. 6.

2009, the first year the State provided coverage for employees' domestic partners and their children. The report states in relevant part,

> In review, the 2008-2009 Plan Year demonstrated a balance of expenses and premiums that allowed the State to offer members comprehensive and affordable insurance coverage. The State effectively controlled the rise in health care costs through quality benefit design, administrative oversight, strategic audit planning and efficient contracts management.[90]

Plaintiffs also attach evidence showing that domestic partner coverage for both same-sex and opposite-sex partners costs the State about $3 million in 2008-2009, in comparison to the $625 million the State spent on health insurance for other employees.[91] Plaintiffs further provide an economist's estimate that "when employees' same-sex partners are provided access to an employer's health plan, enrollment tends to increase by 0.1% to 0.3%."[92] The economist further states that the cost of family coverage for lesbian and gay employees comprises "between 0.06% and 0.27%" of the State's total spending on health benefits.[93] This evidence further increases the likelihood of plaintiffs' success on the merit of their equal protection claim.

In opposition to the motion for a preliminary injunction, the State attaches a spreadsheet indicating that a total of 698 domestic partners participated in the State's health plan in the 2008-2009 plan year, and 893 domestic partners participated in the 2009-2010 plan year. The spreadsheet also lists the total of $4,076,822 claims for domestic partners in 2008-2009, and $5,490,660 for domestic partner claims in the

---

[90]Doc. 32-1 at p. 8.

[91]Doc. 32-2 at p. 2.

[92]Doc. 42 at p. 3.

[93]*Id.* at p. 5.

2009-2010 plan year to date.[94]  However, no information is provided as to the number of same-sex domestic partners participating in the State health plan, nor the total claims of same-sex domestic partners.

For the reasons set out in the court's discussion of the motion to dismiss and based on the further evidence provided by plaintiffs in support of their motion for preliminary injunctive relief, plaintiffs have demonstrated a likelihood of success on the merits on their equal protection claim.

### 2. Irreparable Harm

In *Winter*, the Supreme Court "clarified that preliminary injunctive relief is available only if plaintiffs 'demonstrate that irreparable injury is likely in the absence of an injunction,'" not merely possible.[95]  Plaintiffs have demonstrated several kinds of irreparable harm.  First, because plaintiffs have shown a likelihood of success on the merits of their equal protection claim, plaintiffs have demonstrated the harm of unconstitutional discrimination based on sexual orientation if injunctive relief is not granted.  The Ninth Circuit has stated that "an alleged constitutional infringement will alone constitute irreparable harm."[96]  "Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."[97]

---

[94]It is unclear whether these figures reflect premiums paid by employees.

[95]*Johnson v. Couturier*, 572 F.3d 1067, 1078 (9th Cir. 2009) (quoting *Winter*, 129 S.Ct. at 374).

[96]*Monterey Mechanical Co. v. Wilson,* 125 F.3d 702, 715 (9th Cir. 1997) (quoting *Assoc. General Contractors v. Coalition for Economic Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991)).

[97]*Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008).

Plaintiffs have also demonstrated that they are likely to suffer extreme anxiety and stress in the absence of an injunction enjoining the State from enforcing Section O to eliminate family health insurance eligibility for lesbian and gay State employees. Like the loss of one's job, the loss of one's job benefits "does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages."[98]  Plaintiffs' declarations document that some of them might not be able to secure private health coverage for their domestic partners who have serious pre-existing health conditions and have been refused private coverage in the past.[99]  Several plaintiffs' domestic partners have medical conditions  requiring daily medication and consistent treatment  that if left untreated will likely lead to irreversible health consequences.[100]  In addition, plaintiffs' declarations substantiate the stress of incurring greater financial burdens to provide private insurance coverage for their domestic partners and their children.[101]

Plaintiffs further document the financial hardship that losing family coverage through the State health plan will impose on their families.[102]  While "[i]t is true that economic injury alone does not support a finding of irreparable harm, because such

---

[98]*Id.*

[99]*See, e.g.*, Doc. 31-1 at pp. 2-4; Doc. 31-4 at p. 3; Doc. 31-5 at pp. 2-3; Doc. 31-6 at p. 3, Doc. 31-9 at p. 3.

[100]*See, e.g.*, Doc. 31-1; Doc. 31-4; Doc. 31-5; Doc. 31-6.

[101]*See, e.g.*, Doc. 31-3 at p. 4; Doc. 31-4 at p. 3.

[102]*See, e.g.*, Doc. 31-3 at p. 4; Doc. 31-4 at p. 3; Doc. 31-5 at p. 3; Doc. 31-7 at p. 3; Doc. 31-8 at p. 3; Doc. 31-9 at p. 4.

injury can be remedied by a damage award,"[103] all plaintiffs have demonstrated other harms than economic injury, including the stigma of discriminatory treatment and the harm of receiving unequal compensation for equal work.

The State argues that plaintiffs will not suffer irreparable harm because they will likely be able to obtain coverage for their domestic partners and their children either through private insurance coverage, the Arizona Medicaid agency, or through the employers of their domestic partners.   Even assuming that is true, the Ninth Circuit has recognized there is "an inherent inequality" in allowing some employees to participate fully in the State's health plan, while expecting other employees to rely on other sources, such as private insurance or Medicaid.  "This 'back of the bus' treatment relegates Plaintiffs to a second-class status by imposing inferior workplace treatment on them, inflicting serious constitutional and dignitary harms that after-the-fact damages cannot adequately redress."[104]  For all of the above reasons, plaintiffs have demonstrated the likelihood of irreparable harm in the absence of injunctive relief.

### 3.  Balance of Equities

"To qualify for injunctive relief, the plaintiffs must establish that 'the balance of equities tips in [their] favor.'"[105]  "In assessing whether the plaintiffs have met this burden, the district court has a 'duty ... to balance the interests of all parties and weigh

---

[103] *Rent-A-Center, Inc. v. Canyon Television*, 944 F.2d 597, 603 (9th Cir. 1991).

[104] Doc. 31 at p. 15 (quoting *In re Golinski*, 587 F.3d 956, 960 (9th Cir. 2009))

[105] *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *Winter*, 129 S.Ct. at 374)

the damage to each.'"[106]  Plaintiffs argue that the "extreme hardship to plaintiffs of foregoing family insurance, or paying significantly more for an inferior alternative, greatly outweighs the negligible cost to [the State] of maintaining the status quo."[107]  Plaintiffs further argue that continuing plaintiffs' coverage in a group health plan that the Department of Administration admitted has functioned efficiently and successfully with plaintiffs' participation imposes a small burden on defendants, if any at all.  In addition, plaintiffs contend that any attempt to compensate plaintiffs with damages would be inadequate to remedy the irreparable harms of inequitable treatment and the stress and anxiety caused by the loss of benefits.

The State argues that the balance of equities favors the State, contending that plaintiffs' out-of-pocket expenses and private health insurance costs would be minimal compared to the costs of continuing domestic partner coverage.  The State, however, has not provided any evidence showing the costs to the State of providing coverage for same-sex domestic partners who meet the criteria set forth in Ariz. Admin. Code § R2-5-101.  To the contrary, although the State suggests entry of a preliminary injunction will worsen the State's budget shortfall, the record indicates that the impact of an injunction on the State's budget shortfall would be minimal, particularly in light of the unrefuted estimate that the cost of family coverage for lesbian and gay employees comprises "between 0.06% and 0.27%" of the State's total spending on health benefits.[108]

---

[106]*Id.* (citing *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)).

[107]Doc. 31 at p. 16.

[108]Doc. 42 at p. 5.

The State further argues that granting preliminary injunctive relief and awarding plaintiffs' domestic partner benefits, even temporarily, would "cause harm to other constituents of State services," suggesting that continuing plaintiffs' domestic partner benefits "would cause potential budget cuts for education, indigent health care, public safety, social programs, or perhaps layoffs for some more State employees like the plaintiffs, in order to pay for the domestic partner coverage."[109]  The State's argument, which is not supported by any evidence, is speculative at best, and discriminatory at worst.  Contrary to the State's suggestion, it is not equitable to lay the burden of the State's budgetary shortfall on homosexual employees, any more than on any other distinct class, such as employees with green eyes or red hair.  "Equal protection of the laws is not achieved through indiscriminate imposition of inequalities."[110]  Based on the record, the court concludes that the balance of equities tips in favor of plaintiffs.

### 4.  Public Interest

"The public interest analysis for the issuance of a preliminary injunction requires us to consider 'whether there exists some critical public interest that would be injured by the grant of preliminary relief.'"[111] The State contends that the public's interest in reducing the cost of State employees' health coverage would be injured by granting injunctive relief.  However, as discussed above, the record demonstrates that the impact of injunctive relief on the Arizona's total expenditures for health coverage for State

---

[109]Doc. 40 at p. 14.

[110]*Romer*, 517 U.S. at 633 (quoting *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948)).

[111]*Independent Living Center of Southern California, Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009) (quoting *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed.Cir. 1988)).

employees would be minimal.  Accordingly, the State's budgetary considerations do not "constitute a critical public interest that would be injured by the grant of preliminary relief."[112]

On the other hand, it would not be in the public's interest to allow the State to violate the plaintiffs' rights to equal protection when there are no adequate remedies to compensate plaintiffs for the irreparable harm caused by such violation.[113]  The public interest weighs in favor of injunctive relief.  Because plaintiffs have demonstrated that they are likely to succeed on the merits of their equal protection claim, that they face a significant threat of irreparable injury, and that the balance of equities and the public interest favor them, the court will grant the motion for preliminary injunction.

## V.  CONCLUSION

For the reasons set forth above, the State's motion to dismiss at docket 22 is **GRANTED** in part and **DENIED** in part as follows: (1) the motion is **DENIED** with respect to plaintiffs' equal protection claim; (2) the motion is **GRANTED** with respect to plaintiffs' substantive due process claim; and (3) the motion is **DENIED** as to defendant Brewer's claim of immunity.

It is **FURTHER ORDERED** that plaintiffs' motion for preliminary injunction at docket 31 is **GRANTED** as follows:

1) Defendants are enjoined from enforcing A.R.S. § 38-651(O) to eliminate family insurance eligibility for lesbian and gay State employees, and their domestic

---

[112]*Id.*

[113]*California Pharmacists Ass'n*, 563 F.3d at 852-853.

partners and domestic partners' children who satisfy the criteria set forth in Ariz.

Admin. Code § R2-5-101;

2) Defendants are required to make available family health insurance coverage

for lesbian and gay State employees, including plaintiffs, who satisfy the relevant

eligibility criteria set forth in Ariz. Admin. Code § R2-5-101 to the same extent

such benefits are made available to married State employees;

3) The preliminary injunction shall take effect within ten (10) business days and

shall remain in effect pending trial in this action or further order of the court.

DATED this 23rd day of July, 2010.


/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE